UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PNC BANK, NATIONAL ASSOCIATION,

Plaintiff,

-against-

OPTIMITY ADVISORS, LLC, LRM
PROPERTIES, LLC, RICK D. McNABB and
LYNN A. McNABB,

Defendants.

Civil Action No. 22-cv-7011

**COMPLAINT**

**Premises Address:**
111 East 19th Street
New York, NY 10003
Block: 875
Lot: 11

## COMPLAINT

Plaintiff PNC Bank, National Association ("***Plaintiff***" or "***Lender***"), asserts this action against Defendants Optimity Advisors, LLC, LRM Properties, LLC , Rick D. McNabb and Lynn A. McNabb (collectively, "***Defendants***") and, in support thereof, alleges as follows:

## SUMMARY OF COMPLAINT

1.      Plaintiff brings this action to recover more than $7 million owed by Defendants under certain Loan Documents, as defined below, and to foreclose upon its security interests in certain property securing the loans, including a mortgaged premises located in this District, at 111 East 19th Street, New York, New York 10003.

## PARTIES

2.      Plaintiff is a national banking association with its principal place of business located at Pittsburgh, Pennsylvania.  Plaintiff is the holder of certain Loan Documents, as defined below, that are the subject of this lawsuit.

3.      Defendant Optimity Advisors, LLC is a Delaware Limited Liability Company with an address at 1600 K Street Northwest, Suite 202, Washington, DC 20006 ("***Optimity***").  On information and belief, Optimity's members are two natural persons: Defendant Rick McNabb, a

resident and citizen of the State of Florida, and non-party Lewis Gerten, a resident and citizen of the State of Minnesota. Optimity is made a party defendant herein (1) by reason of Optimity's principal obligations to make payments to Plaintiff under the Optimity Loan Documents, as defined below, and (2) to preserve Plaintiff's right to seek a deficiency judgment or any other amounts owed on account of Optimity's liability and obligations under the Optimity Loan Documents and the LRM Guaranty, as defined below.

4. Defendant LRM Properties, LLC is a Minnesota Limited Liability Company with an address at 672 Wesley Court, Mendota Heights, Minnesota 55118 ("***LRM***"). LRM's sole member is Defendant Rick McNabb, a resident and citizen of the State of Florida. LRM is made a party defendant herein (1) by reason of being the mortgagor under the Mortgages, as defined below, encumbering certain real property located in the Borough of Manhattan, County of New York, State of New York, known as and by the street address of 111 East 19th Street, New York, New York 10003, also known as Block 875, Lot 11, together with all buildings, structures, improvements, and the other property, rights, interests and estates set forth in the Mortgages, then or thereafter located thereon, more particularly described on SCHEDULE A annexed to the Mortgages (the "***Mortgaged Premises***"), (2) by reason of LRM's liability and obligations to make payments to Plaintiff under the LRM Loan Documents, as defined below, and (3) to preserve Plaintiff's right to seek a deficiency judgment or any other amounts owed on account of LRM's liability and obligations under the LRM Loan Documents and the Second Optimity Guaranty, as defined below.

5. Defendants Rick D. McNabb and Lynn A. McNabb are residents and citizens of the State of Florida (together, "***McNabbs***"). The McNabbs are made party defendants herein to preserve Plaintiff's right to seek a deficiency judgment or any other amounts owed on account of

(1) of Rick McNabb's liability and obligations under the First Optimity Guaranty, as defined below, and (2) the McNabbs' liability and obligations under the LRM Guaranty, as defined below.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

7.      First, as stated in Paragraph 1 and discussed further below, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      Second, there is complete diversity of citizenship between Plaintiff and Defendants.

  a.      Plaintiff is a national banking association with its main office located in Pittsburgh, Pennsylvania, and thus is a citizen of the Commonwealth of Pennsylvania for jurisdictional purposes. *See Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006).

  b.      In turn, Defendants are citizens of Florida and Minnesota: (i) the McNabbs are citizens of Florida; (ii) LRM is a citizen of Florida by virtue of its sole member's citizenship in that State; and (iii) Optimity is a citizen of both Florida and Minnesota by reason of its two members' respective citizenship in such States. *See Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012).

9.      Venue is properly vested in this district pursuant to 28 U.S.C. § 1391(b)(1) because each Defendant is a resident of this district pursuant to 28 U.S.C. § 1391(c) insofar as each Defendant irrevocably consented to the exclusive jurisdiction of any state or federal court in New York in certain of the Loan Documents, as defined below.

a.     Optimitry and the McNabbs gave their "irrevocable consent[] to the exclusive jurisdiction of any state or federal court in the county or judicial district of the State of New York" in Section 20 of the LRM Guaranty, as defined below.

b.     LRM gave its "irrevocable consent[] to the exclusive jurisdiction of any state or federal court in New York County or the State of New York" in Section 9.15 of the LRM Loan Agreement, and in Section 19 of the First LRM Mortgage, as defined below.

c.     In those same Loan Document provisions, Defendants also waived any objections to venue, including any objection based on a more convenient forum.

10.    Venue also is properly vested in this district pursuant to 28 U.S.C. § 1391(b)(2) because the Mortgaged Premises that is the subject of this action is located in this district.

## FACTS

11.    Defendant Rick McNabb owns and controls Optimity and LRM (together "***Borrowers***").

12.    Plaintiff lent millions of dollars to each Borrower pursuant to certain Loan Documents, as defined below.  Among other things, Borrowers' obligations to Plaintiff are secured by three Guaranties and two Mortgages on the Mortgaged Premises, as discussed further below.

13.    Borrowers are and have been in default of their payment obligations to Plaintiff.

14.    On three different occasions, beginning in July 2019, Plaintiff agreed to forbear executing on Borrowers' defaulted payment obligations to allow Borrowers time to pursue financing opportunities that would permit them to satisfy their obligations in full.  Nevertheless, Borrowers have failed to satisfy or cure their defaulted payment obligations, so Plaintiff brings this lawsuit to foreclose on the Mortgages and enforce the outstanding payment obligations.

## I.    Optimity Loan Documents.

15.    On or about May 25, 2017, Plaintiff extended a line of credit to Optimity in the amount of Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00) ("***Optimity Loan***").

16.    In connection with the Optimity Loan, Plaintiff and Optimity entered into that certain Loan Agreement dated May 25, 2017, as amended by that certain Borrowing Base Rider also dated May 25, 2017 (together "***Optimity Loan Agreement***").  The Optimity Loan Agreement, among other things, describes the Optimity Loan, identifies the various security interests securing the Optimity Loan, and sets forth certain of Optimity's obligations under the Optimity Loan.  A true and correct copy of the Optimity Loan Agreement is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 1**.

17.    To evidence the indebtedness under the Optimity Loan, Optimity executed and delivered to Plaintiff that certain Committed Line of Credit Note (Daily LIBOR) dated May 25, 2017 in the original maximum principal amount of Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00) ("***Optimity Loan Note***").  A true and correct copy of the Optimity Loan Note is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 2**.

18.    Section 5 of the Optimity Loan Note provides that, upon the occurrence of an Event of Default, interest must be paid at the Default Rate (as that term is defined in the Optimity Loan Note).

19.    To secure the payment and performance in full of the Optimity Loan Note and the other amounts due and owing to Plaintiff in connection with the Optimity Loan, Plaintiff and Optimity entered into that certain Security Agreement dated May 25, 2017 ("***Optimity Security Agreement***").  Through the Optimity Security Agreement, Optimity assigned and granted to Plaintiff as secured party a continuing lien and security interest in certain Collateral, as defined in

the Optimity Security Agreement, including all of Optimity's personal property, accounts receivables, securities accounts, and deposit accounts.  A true and correct copy of the Optimity Security Agreement is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 3**.

20.     To perfect its security interest in the Collateral under the Optimity Security Agreement, Plaintiff filed a UCC Financing Statement on June 23, 2017 with the Delaware Department of State as Filing No. 20174144348 which names Plaintiff as the secured party and Optimity as the debtor ("***Optimity Financing Statement***").  A true and correct copy of the Optimity Financing Statement is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 4**.

21.     On May 11, 2022, Plaintiff filed a Continuation of the Optimity Financing Statement with the Delaware Department of State as Filing No. 20223986478 ("***Continuation***"). A true and correct copy of the Continuation is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 5**.

22.     As an inducement for Plaintiff to provide the Optimity Loan to Optimity, Rick McNabb executed and delivered to Plaintiff that certain Guaranty and Suretyship Agreement dated May 25, 2017 ("***First Optimity Guaranty***").  A true and correct copy of the First Optimity Guaranty is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 6**.

23.     Under the First Optimity Guaranty, Rick McNabb unconditionally guaranteed, as primary obligor, and became surety for "(i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification,

enforcement, collection and otherwise in connection with the Obligations."  ("***First Optimity Guaranty Obligations***").

24.    Section 1(a) of the First Optimity Guaranty defines Obligations as:

> all loans, advances, debts, liabilities, obligations, covenants and duties owing by [Optimity] to [Plaintiff] or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to [Optimity], whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of [Plaintiff] to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of [Plaintiff's] nonreceipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements, or (viii) arising from any amendments, extensions, renewals and increases of or to any of the foregoing.

*See* Ex. 6 (First Optimity Guaranty), § 1(a).  Notwithstanding the foregoing, the definition of the term "Obligations" excluded certain "Excluded Swap Obligations" as defined in Section 1(b) of the First Optimity Guaranty.

25.    The Optimity Loan Agreement, Optimity Loan Note, Optimity Security Agreement, UCC Financing Statement and Continuation, First Optimity Guaranty, and all other documents securing payment under the Optimity Loan Note, as well as all other documents executed in connection with the Optimity Loan, including the Second Optimity Guaranty, defined below, shall be referred to collectively as "***Optimity Loan Documents***."

## II.      LRM Loan Documents.

26.     On or about September 11, 2018, Plaintiff consolidated several loans made to LRM in the original maximum principal amount of Six Million Nine Hundred Thousand and 00/100 Dollars ($6,900,000.00) ("**LRM Loan**").

27.     In connection with the LRM Loan, Plaintiff and LRM entered into that certain Building Loan Agreement dated September 11, 2018 ("**LRM Loan Agreement**").  The LRM Loan Agreement, among other things, describes the LRM Loan, identifies the various security interests securing the LRM Loan, and sets forth certain of LRM's obligations under the LRM Loan.  A true and correct copy of the LRM Loan Agreement is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 7**.

28.     To evidence the indebtedness under the LRM Loan, LRM executed and delivered to Plaintiff that certain Amended and Restated Building Loan Note (LIBOR Only After Conversion – Designated Rate Reset) dated September 11, 2018 in the original maximum principal amount of Six Million Nine Hundred Thousand and 00/100 Dollars ($6,900,000.00) ("**LRM Loan Note**" and, together with the Optimity Loan Note, "**Notes**").  A true and correct copy of the LRM Loan Note is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 8**.

29.     Section 5 of the LRM Loan Note provides that, upon the occurrence of an Event of Default, interest must be paid at the Default Rate (as that term is defined in the LRM Loan Note). Separately, the interest rate on the LRM Loan Note was subject to the terms and conditions of that certain ISDA 2002 Master Agreement dated September 11, 2018, entered into between LRM and Plaintiff whereby the parties agreed to exchange variable interest rates for specified rates on future payment streams over a set period pursuant to the terms of said agreement ("**ISDA Swap**").

30.     To secure the payment and performance in full of the LRM Loan Note and the other amounts due and owing to Plaintiff in connection with the LRM Loan, LRM executed and

delivered that certain Building Loan Mortgage Consolidation, Extension and Modification Agreement dated September 11, 2018 ("***First LRM Mortgage***") in favor of Plaintiff, amending, restating and consolidating the Existing Mortgages (as that term is defined in the First LRM Mortgage) on the Mortgaged Premises, and securing all amounts due and owing by LRM under the LRM Loan Note and the other LRM Loan Documents, as hereinafter defined.

31.     The First LRM Mortgage was recorded in the Office of the City Register of the City of New York ("***Register's Office***") on September 21, 2018 in CRFN 2018000316028.  A true and correct copy of the recorded First LRM Mortgage is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 9**.

32.     The First LRM Mortgage also includes a security agreement in favor of Plaintiff which creates a security interest in, among other things, all of LRM's estate in the Mortgaged Premises, including all buildings, structures, improvements, and fixtures then owned or thereafter acquired by LRM as more fully described therein (collectively, "***LRM Loan Collateral***").  To perfect its security interest in the LRM Loan Collateral, Plaintiff filed that certain UCC Financing Statement in the Register's Office on September 21, 2018 in CRFN 2018000316030 ("***LRM Loan Financing Statement***").  A true and correct copy of the recorded LRM Loan Financing Statement is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 10**.

33.     Pursuant to the First LRM Mortgage, LRM granted to Plaintiff a first priority mortgage lien on the Mortgaged Premises.

34.     To further secure the obligations under the LRM Loan Note and the other LRM Loan Documents, LRM executed and delivered that certain Assignment of Rents, Leases and Profit dated September 11, 2018 ("***LRM Loan ALR***") in favor of Plaintiff.  The LRM Loan ALR was recorded in the Register's Office on September 21, 2018 in CRFN 2018000316029.  A true and

correct copy of the recorded LRM Loan ALR is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 11**.

35.     As an inducement for Plaintiff to provide the LRM Loan to LRM, Optimity and the McNabbs executed and delivered to Plaintiff that certain Guaranty and Suretyship Agreement dated September 11, 2018 ("***LRM Guaranty***").  A true and correct copy of the LRM Guaranty is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 12**.

36.     Under the LRM Guaranty, Optimity and the McNabbs jointly and severally, individually and collectively, unconditionally guaranteed, as primary obligors, and became surety for "(i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations."  ("***LRM Guaranty Obligations***").

37.     Section 1(a) of the LRM Guaranty defines Obligations as:

all loans, advances, debts, liabilities, obligations, covenants and duties owing by [LRM] to [Plaintiff] or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to [LRM], whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of [Plaintiff] to receive final payment for, any check, item, instrument, payment order or other

deposit or credit to a deposit or other account, or out of [Plaintiff's] nonreceipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements, or (viii) arising from any amendments, extensions, renewals and increases of or to any of the foregoing.

*See* Ex. 12 (LRM Guaranty), § 1(a).  Notwithstanding the foregoing, the definition of the term "Obligations" excluded certain "Excluded Swap Obligations" as defined in Section 1(b) of the LRM Guaranty.

38.     The LRM Loan Agreement, LRM Loan Note, First LRM Mortgage, LRM Loan ALR, LRM Financing Statement, LRM Guaranty, and all other documents securing payment under the LRM Loan Note, as well as all other documents executed in connection with the LRM Loan, including the Second LRM Mortgage, defined below, shall be referred to collectively as "***LRM Loan Documents***."

### III.     Borrowers' Defaults, Forbearance Agreements and Additional Security.

39.     By early 2019, several Events of Defaults had occurred and were continuing under the terms of the Optimity Loan Documents.

40.     First, Optimity had failed to comply with the Tangible Net Worth covenant set forth in Section 4.8 of the Optimity Loan Agreement, for the quarters ended December 31, 2018 and March 31, 2019.  Second, Optimity had failed to comply with the Borrowing Base Rider to the Optimity Loan Agreement.  Third, Optimity had failed to pay Plaintiff the outstanding principal balance and accrued and unpaid interest as due and payable on May 25, 2019 pursuant to Section 4 of the Optimity Loan Note.  Each of these failures constituted an Event of Default pursuant to the terms of the Optimity Loan Note and the Optimity Loan Agreement.

41.     Among other things, the foregoing Events of Default entitled Plaintiff to accelerate the Optimity Loan Note, to demand immediate payment from Optimity of all outstanding principal and interest pursuant to Section 9 of the Optimity Loan Note, to demand payment of interest at the

Default Rate from the date of the first Event of Default, and to demand payment of those same obligations from Rick McNabb under the First Optimity Guaranty.

42.     Furthermore, the foregoing Events of Default also constituted a cross-default of the LRM Loan Note.  Section 9 of the LRM Loan Note defines Event of Default to include, among other things, "the occurrence of any event of default or any default and the lapse of any notice and cure period, or any Obligor's failure to observe or perform any covenant or other agreement, under or contained in any Loan Document or any other document now or in the future evidencing or securing any debt, liability or obligation of any Obligor to the Bank."  As guarantor of the LRM Loan Note under the LRM Guaranty, Optimity is and was an "Obligor" whose failure to perform its obligations under the Optimity Loan Documents, which evidence debt and obligations to Plaintiff, constitutes an Event of Default under the LRM Loan Note.

43.     Among other things, the foregoing cross-default entitles Plaintiff to accelerate the LRM Loan Note, to demand immediate payment from Optimity of all outstanding principal and interest pursuant to Section 9 of the LRM Loan Note, and to demand payment of interest at the Default Rate from the date of the first Event of Default.

    A.     <u>July 22, 2019 Forbearance Agreement</u>.

44.     Notwithstanding Plaintiff's rights to enforce its rights upon the foregoing Events of Default, Borrowers requested that Plaintiff agree to forebear from enforcing its rights for a period of time.  Plaintiff agreed, subject to certain conditions, as memorialized in that certain Forbearance and Amendment Agreement dated as of July 22, 2019 ("***Forbearance Agreement***").  A true and correct copy of the Forbearance Agreement is annexed hereto, made a part hereof, and incorporated by reference as **<u>Exhibit 13</u>**.

45.     Under the Forbearance Agreement, Plaintiff agreed that, provided no Forbearance Event of Default occurred, Plaintiff would agree to forebear from enforcing its rights against

Borrowers under the Optimity Loan Documents and the LRM Loan Documents until September 30, 2019, defined as the "***Forbearance Termination Date***" in the Forbearance Agreement.  Ex. 13 (Forbearance Agreement), § 12.

46.      In consideration for Plaintiff's commitments under the Forbearance Agreement, Borrowers acknowledged and agreed, among other things, that:

> a.      The Optimity Loan Documents and LRM Loan Documents were valid and enforceable in every respect (Ex. 13 (Forbearance Agreement), § 1);

> b.      Events of Default had occurred under the Optimity Loan Documents and LRM Loan Documents (*see id*.);

> c.      LRM would execute and deliver to Plaintiff a Guaranty and Suretyship Agreement as additional security for Optimity's obligations under the Optimity Loan Documents (*see id*., § D);

> d.      LRM would execute and deliver to Plaintiff a second mortgage on the Mortgaged Premises as additional security for Optimity's obligations under the Optimity Loan Documents (*see id*.);

> e.      Borrowers would engage the services of a financial consultant reasonably acceptable to the Bank, for the development of a turn-around plan (*see id*., § 8);

> f.      Upon the execution of the Forbearance Agreement, Borrowers would reimburse Plaintiff for all fees, costs and expenses incurred by Plaintiff in connection with executing the Forbearance Agreement ("***Counsel Fee Obligation***") (*see id*., § 9);

> g.      Upon demand, on or after the Forbearance Termination Date, Borrowers would reimburse Plaintiff for all fees and taxes incurred by Plaintiff to record the

second mortgage on the Mortgaged Premises as required by the Forbearance Agreement ("***Second Mortgage Fee Obligation***") (*see id.*, § 9);

h.      Upon the execution of the Forbearance Agreement, Borrowers would pay Plaintiff a forbearance fee of $40,000.00 ("***Forbearance Fee Obligation***") (*see id.*, § 10); and

i.      Borrowers' failure to timely pay any obligation due, or to perform any covenants under either the Optimity Loan Documents, the LRM Loan Documents, or the Forbearance Agreement (other than the Events of Default giving rise to the Forbearance Agreement), would constitute a "***Forbearance Event of Default***," entitling Plaintiff to enforce all remedies under the Optimity Loan Documents and the LRM Loan Documents (*see id.*, §§ 12-13).

47.      Pursuant to the terms of the Forbearance Agreement and in consideration for the benefits received therein, LRM executed and delivered to Plaintiff that certain Guaranty and Suretyship Agreement dated July 22, 2019 ("***Second Optimity Guaranty***" and, together with the LRM Guaranty and the First Optimity Guaranty, "***Guaranties***").  A true and correct copy of the Second Optimity Guaranty is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 14**.

48.      Under the Second Optimity Guaranty, LRM unconditionally guaranteed, as primary obligor, and became surety for "(i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations."  ("***Second Optimity Guaranty Obligations***").

49.     Section 1(a) of the Second Optimity Guaranty defines Obligations as:

all loans, advances, debts, liabilities, obligations, covenants and duties owing by
[Optimity] to [Plaintiff] or to any other direct or indirect subsidiary of The PNC
Financial Services Group, Inc., of any kind or nature, present or future (including
any interest accruing thereon after maturity, or after the filing of any petition in
bankruptcy, or the commencement of any insolvency, reorganization or like
proceeding relating to [Optimity], whether or not a claim for post-filing or post-
petition interest is allowed in such proceeding), whether direct or indirect
(including those acquired by assignment or participation), absolute or contingent,
joint or several, due or to become due, now existing or hereafter arising, whether
or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under
any agreement, instrument or document, (iii) for the payment of money, (iv) arising
by reason of an extension of credit, opening of a letter of credit, loan, equipment
lease or guarantee, (v) under any interest or currency swap, future, option or other
interest rate protection or similar agreement, (vi) under or by reason of any foreign
currency transaction, forward, option or other similar transaction providing for the
purchase of one currency in exchange for the sale of another currency, or in any
other manner, (vii) arising out of overdrafts on deposit or other accounts or out of
electronic funds transfers (whether by wire transfer or through automated clearing
houses or otherwise) or out of the return unpaid of, or other failure of [Plaintiff] to
receive final payment for, any check, item, instrument, payment order or other
deposit or credit to a deposit or other account, or out of [Plaintiff's] nonreceipt of
or inability to collect funds or otherwise not being made whole in connection with
depository or other similar arrangements, or (viii) arising from any amendments,
extensions, renewals and increases of or to any of the foregoing.

*See* Ex. 14 (Second Optimity Guaranty), § 1(a).  Notwithstanding the foregoing, the definition of

the term "Obligations" excluded certain "Excluded Swap Obligations" as defined in Section 1(b)

of the Second Optimity Guaranty.

50.     Pursuant to the terms of the Forbearance Agreement and in consideration for the

benefits received therein, Borrower executed and delivered that certain Mortgage dated July 22,

2019 ("***Second LRM Mortgage***" and, together with the First LRM Mortgage, "***Mortgages***") in

favor of Plaintiff on the Mortgaged Premises, and securing all amounts due and owing by and to

secure the payment and performance in full of the Second Optimity Guaranty.

51.     The Second LRM Mortgage was recorded in the Register's Office on August 1, 2019 in CRFN 2019000243905.  A true and correct copy of the recorded Second LRM Mortgage is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 15**.

52.     Pursuant to the Second LRM Mortgage, LRM granted to Plaintiff a second priority mortgage lien on the Mortgaged Premises.

B.      Amended Forbearance Agreement.

53.     The Forbearance Agreement expired by its terms on September 30, 2019 – *i.e.*, the Forbearance Termination Date – yet Borrowers still had not cured their Events of Default, including satisfying the defaulted payment obligations under the Optimity Loan Note.  Further, Forbearance Events of Default occurred due to, among other things, Borrowers' failure to pay Plaintiff the money owed under the Counsel Fee Obligation or the Second Mortgage Fee Obligation.

54.     Based on the foregoing, Plaintiff was entitled to exercise its rights to accelerate the Optimity Loan and the LRM Loan and to demand immediate payment thereunder.  Borrowers requested that Plaintiff agree to continue to forebear from enforcing its rights to enable Borrowers to secure financing that would enable them to pay down all obligations due and owing under the Optimity Loan Documents, LRM Loan Documents, and Forbearance Agreement.

55.     Plaintiff agreed, subject to certain conditions, as memorialized in that certain First Amendment to Forbearance and Amendment Agreement dated as of August 17, 2020, with an effective date of September 30, 2019 ("***Amended Forbearance Agreement***").  A true and correct copy of the Amended Forbearance Agreement is annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 16**.

56.     Under the Amended Forbearance Agreement, Plaintiff agreed that, provided no Forbearance Event of Default occurred, Plaintiff would extend the Forbearance Termination Date,

thereby forbearing from enforcing its rights against Borrowers under the Optimity Loan Documents, the LRM Loan Documents and the Forbearance Agreement until October 31, 2020. Ex. 16 (Amended Forbearance Agreement), § 11.

57.     In consideration for Plaintiff's commitments under the Amended Forbearance Agreement, Borrowers acknowledged and agreed, among other things, that:

     a.     The Optimity Loan Documents, LRM Loan Documents and Forbearance Agreement were valid and enforceable in every respect (Ex. 16 (Amended Forbearance Agreement), § 1);

     b.     Events of Default had occurred under the Optimity Loan Documents and LRM Loan Documents (*see id*.);

     c.     Borrowers owed Plaintiff more than $7.7 million under the Optimity Loan Documents and LRM Loan Documents, plus more than $250,000 under the Counsel Fee Obligation, the Second Mortgage Fee Obligation, and the Forbearance Fee Obligation set forth in the Forbearance Agreement (*see id*., § 4);

     d.     Borrowers would reimburse Plaintiff for all fees, costs and expenses incurred by Plaintiff in connection with executing the Amended Forbearance Agreement ("***Second Counsel Fee Obligation***") (*see id*., § 7);

     e.     Borrowers would pay Plaintiff a forbearance fee of $20,000.00 upon the execution of the Amended Forbearance Agreement ("***Forbearance Extension Fee Obligation***") (*see id*., § 8); and

     f.     Borrowers would pay Plaintiff $20,000 each month until the termination of the Amended Forbearance Agreement, with such funds to apply toward the principal amount owed under the Optimity Loan Note ("***Monthly Payment***

***Obligation***") (*see id.*, § 9).

C.    Second Amended Forbearance Agreement.

58.    The Amended Forbearance Agreement expired by its terms on October 31, 2020 –
*i.e.*, the amended Forbearance Termination Date –  yet Borrowers still had not cured their Events
of Default, including with respect to the defaulted payment obligations on the Optimity Loan Note.
Further, Forbearance Events of Default occurred due to, among other things, Borrowers' failure to
comply with the terms of the Forbearance Agreement and Amended Forbearance Agreement.
Among other things, Borrowers failed to pay Plaintiff the money owed under the Counsel Fee
Obligation, the Second Mortgage Fee Obligation, the Second Counsel Fee Obligation, the
Forbearance Extension Fee Obligation or the Monthly Payment Obligation.

59.    Based on the foregoing, Plaintiff was entitled to exercise its rights to accelerate the
Optimity Loan and the LRM Loan and to demand immediate payment thereunder.  Borrowers
requested that Plaintiff agree to continue to forebear from enforcing its rights to enable Borrowers
to secure financing that would enable them to pay down all obligations due and owing under the
Optimity Loan Documents, LRM Loan Documents, Forbearance Agreement and Amended
Forbearance Agreement.

60.    Plaintiff agreed, subject to certain conditions, as memorialized in that certain
Second Amendment to Forbearance and Amendment Agreement dated as of May 18, 2021, with
an effective date of October 31, 2020 ("***Second Amended Forbearance Agreement***" and, together
with the Forbearance Agreement and the Amended Forbearance Agreement, "***Forbearance
Agreements***").  A true and correct copy of the Second Amended Forbearance Agreement is
annexed hereto, made a part hereof, and incorporated by reference as **Exhibit 17**.

61.    The Forbearance Agreements, together with the Optimity Loan Documents, and the
LRM Loan Documents, shall be referred to collectively as the "***Loan Documents***."

62.     Under the Second Amended Forbearance Agreement, Plaintiff agreed that, provided no Forbearance Event of Default occurred, Plaintiff would again extend the Forbearance Termination Date, thereby forbearing from enforcing its rights against Borrowers under the Optimity Loan Documents, the LRM Loan Documents, the Forbearance Agreement and the Amended Forbearance Agreement until November 30, 2021.   Ex. 17 (Second Amended Forbearance Agreement), § 11.

63.     In consideration for Plaintiff's commitments under the Second Amended Forbearance Agreement, Borrowers acknowledged and agreed, among other things, that:

a.     The Loan Documents were valid and enforceable in every respect (Ex. 17 (Second Amended Forbearance Agreement), § 1);

b.     Events of Default had occurred under the Optimity Loan Documents and LRM Loan Documents (*see id*.);

c.     Borrowers owed Plaintiff more than $7.6 million under the Loan Documents (*see id*., § 4);

d.     Borrowers would reimburse Plaintiff for all fees, costs and expenses incurred by Plaintiff in connection with executing the Second Amended Forbearance Agreement ("***Third Counsel Fee Obligation***") (*see id*., § 7);

e.     The interest rate set forth in the Loan Documents would be increased effective April 1, 2021 through November 30, 2021 ("***Forbearance Interest Rate Obligation***") (*see id*., § 8); and

f.     Borrowers would pay Plaintiff $50,000 each month until the termination of the Second Amended Forbearance Agreement, with such funds to apply toward the principal amount owed under the Optimity Loan Note ("***Amended Monthly***

*Payment Obligation*" and, together with the Counsel Fee Obligation, the Second Mortgage Fee Obligation, the Forbearance Fee Obligation, the Second Counsel Fee Obligation, the Forbearance Extension Fee Obligation, the Monthly Payment Obligation, and the Second Counsel Fee Obligation, the "*Forbearance Fee Payment Obligations*") (*see id.*, § 9).

**IV.    Forbearance Events of Default and Additional Defaults under the Loan Documents.**

64.     The Second Amended Forbearance Agreement expired by its terms on November 30, 2021 – *i.e.*, the further amended Forbearance Termination Date – resulting in a "*Forbearance Termination Date*" under the terms of the Forbearance Agreements and entitling Plaintiff to enforce all rights under the Loan Documents.

65.     As of November 30, 2021, Borrowers were in default of numerous obligations under the Loan Documents. Further, Forbearance Events of Default occurred due to, among other things, Borrowers' failure to comply with the terms of the Loan Documents.  Borrowers also failed to comply with most of the Forbearance Fee Payment Obligations, including the Counsel Fee Obligation, the Second Mortgage Fee Obligation, the Second Counsel Fee Obligation, the Forbearance Extension Fee Obligation, the Monthly Payment Obligation, and the Third Counsel Fee Obligation.

66.     By two letters dated April 26, 2022, Plaintiff provided Defendants with written demands under the Loan Documents – one to Optimity and one to LRM – reminding Borrowers that a Forbearance Termination Date had occurred, and that all obligations due and owing under the Loan Documents were immediately due and payable (respectively, "*Optimity Demand Letter*" and "*LRM Demand Letter*" and, together, "*Demand Letters*").  True and correct copies of the Optimity Demand Letter and LRM Demand Letter are annexed hereto, made a part hereof, and incorporated by reference, respectively, as **Exhibit 18** and **Exhibit 19.**

20

67.     The Optimity Demand Letter informed Optimity – with a carbon copy to Rick McNabb and LRM as Guarantors – that, as of April 25, 2022, the principal amount of $3,461,979.96, together with accrued and unpaid interest in the amount of $49,016.18, late charges in the amount of $800.00, expenses in the amount of $193,625.43, and Plaintiff's attorneys' fees in the amount of $19,033.45 were due and owing under the Forbearance Agreements, the Optimity Loan Agreement, and the other Optimity Loan Documents (together "***Outstanding Optimity Loan Obligations***").

68.     The LRM Demand Letter informed LRM – with a carbon copy to Optimity and the McNabbs as Guarantors – that, as of April 25, 2022, the principal amount of $3,481,693.53, together with accrued and unpaid interest in the amount of $51,191.55, late charges in the amount of $500.00, expenses in the amount of $20,517.18, Plaintiff's attorneys' fees in the amount of $19,033.45 and estimated swap breakage costs are $70,000.00 were due and owing under the Forbearance Agreements, the LRM Loan Agreement, and the other LRM Loan Documents.  The LRM Demand Letter further advised that that final swap breakage costs could not be determined at that time (together "***Outstanding LRM Loan Obligations***").

69.     Both Demand Letters further reminded Borrowers that, pursuant to the Loan Documents, they are "obligated to pay all costs and expenses incurred by [Plaintiff] in the enforcement of the" Outstanding Optimity Loan Obligations and Outstanding LRM Loan Obligations, "including, but not limited to, reasonable fees and expenses of [Plaintiff's] counsel," and that Plaintiff "reserves all rights to collect such amounts."

70.     To date, Optimity has failed to comply with its obligations under the Loan Documents to pay Plaintiff the Outstanding Optimity Loan Obligations.

71.     Similarly, Rick McNabb and LRM have failed to comply with their respective

obligations under the First Optimity Guaranty and the Second Optimity Guaranty to pay Plaintiff the Outstanding Optimity Loan Obligations, even though each guaranteed "(i) the prompt payment and performance of [such] Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with [such] Obligations." Ex. 6 (First Optimity Guaranty), § 1(a); Ex. 14 (Second Optimity Guaranty), § 1(a).

72. To date, LRM has failed to comply with its obligations under the Loan Documents to pay Plaintiff the Outstanding LRM Loan Obligations.

73. Similarly, the McNabbs and Optimity have failed to comply with their joint and several obligations under the LRM Guaranty to pay Plaintiff the Outstanding LRM Loan Obligations, even though each guaranteed "(i) the prompt payment and performance of [such] Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with [such] Obligations." Ex. 12 (LRM Guaranty), § 1(a).

### FIRST CAUSE OF ACTION
### (*FORECLOSURE OF THE MORTGAGES*)

74. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 73 hereof as if more fully set forth herein.

75. Plaintiff is the lawful holder of the LRM Loan Note, the Optimity Loan Note, the Mortgages and all other Loan Documents.

76. As of July 28, 2022, there remains due and owing to Plaintiff from LRM under the LRM Loan Note and the First LRM Mortgage the sum of $3,646,597.24, consisting of: (a) the entire outstanding principal balance of the LRM Loan in the amount of $3,481,693.53, together

with (b) accrued and unpaid interest in the amount of $86,695.53, (c) late charges in the amount of $900.00, (d) reimbursable expenses in the amount of $20,517.18, (e) Plaintiff's legal fees in the amount of $17,791, and (f) ISDA Swap breakage costs of approximately $39,000.00, pursuant to the terms of the Forbearance Agreements, the LRM Loan Agreement, and the other LRM Loan Documents.

77.     As of July 28, 2022, there remains due and owing to Plaintiff from LRM under the Second Optimity Guaranty and the Second LRM Mortgage the sum of $3,765,600.36, consisting of: (a) the entire outstanding principal balance of the Optimity Loan in the amount of the principal amount of $3,461,979.96, together with (b) accrued and unpaid interest in the amount of $91,103.97, (c) late charges in the amount of $1,100.00, (d) reimbursable expenses in the amount of $193,625.43, and (e) Plaintiff's legal fees in the amount of $17,791.00, pursuant to the Forbearance Agreements, the Optimity Loan Agreement, and the other Optimity Loan Documents.

78.     Numerous Events of Default under the LRM Loan Agreement and other Loan Documents have occurred, and remain uncured to this date, including: (a) LRM's failure make timely monthly payments due under the LRM Loan Note beginning in 2019, and subsequent thereto; (b) LRM's failure make timely the payment of all sums due under the Second Optimity Guaranty; and (c) Optimity's cross-defaults arising from its uncured failures (i) to comply with the Tangible Net Worth in the Optimity Loan Agreement, (ii) to comply with the Borrowing Base Rider to the Optimity Loan Agreement, and (iii) to pay Plaintiff the outstanding principal balance and accrued and unpaid interest due under the Optimity Loan Note on or before March 25, 2019 and subsequent thereto.

79.     Based on the Events of Default that exists under the Loan Documents, Plaintiff is entitled to commence this foreclosure action.  *See* Ex. 9 (First LRM Mortgage), Ex. C § 12(b); Ex. 15 (Second LRM Mortgage), § 13(b).

80.     In order to protect its security, Plaintiff may be compelled during the pendency of this action to pay charges affecting the Mortgaged Premises, including, but not limited to, taxes, assessments, water rates, sewer rents and insurance premiums.  Plaintiff requests that any sums so paid and expended by it during the pendency of this foreclosure action be added, pursuant to the Loan Documents, to its claim and repaid to Plaintiff from the proceeds of the sale of the Mortgaged Premises, together with interest thereon at the Default Rate from the date that such expenditures are made, and that same be added to the amounts due and owing under the Loan Documents and secured by the Mortgages.

81.     No other action or proceeding has been commenced or maintained or is now pending at law or otherwise in the State of New York for the foreclosure of the Mortgages, or for recovery of the sum secured by the Mortgages, or any part thereof.

82.     None of the Defendants are infants, absentees or incompetents, nor have they been proceeded against as such.

83.     All required mortgage tax associated with the Mortgages has been paid.

84.     All conditions precedent necessary to bring forth the claims set forth herein have been satisfied.

85.     Plaintiff shall not be deemed to have waived, altered, released or changed any election hereinbefore made, by reason of the payment after the date of the commencement of this action, of any or all of the defaults mentioned herein, and such election shall continue and remain effective.

86.     Plaintiff has no adequate remedy at law.

87.     Upon the issuance of the requested judgment of foreclosure and the occurrence of the sale requested herein, the Mortgaged Premises should be sold subject to (a) any covenants, restrictions, easements and public utility agreements of record; (b) any state of facts that an accurate survey and physical inspection would show; (c) any restrictions, regulations and building and zoning ordinances of any municipal authority having jurisdiction thereof; (d) any municipal, departmental and other governmental violations; (e) any lien or liens of unpaid taxes, assessments, sewer rents and water rates or charges for maintenance of street vaults, if any; and (f) any prior liens of record.

## SECOND CAUSE OF ACTION
### (*Foreclosure of the Security Agreements*)

88.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 87 hereof as if more fully set forth herein.

89.     This cause of action seeks to foreclose upon the Optimity Security Agreement and the First LRM Mortgage insofar as each constitutes security agreements under the Uniform Commercial Code of the State of New York ("*UCC*").

90.     Through the Optimity Security Agreement, Optimity assigned and granted to Plaintiff as secured party a continuing lien and security interest in certain Collateral, as defined in the Optimity Security Agreement, including all of Optimity's personal property, accounts receivables, securities accounts, and deposit accounts ("*Optimity Loan Collateral*").

91.     To perfect its security interest in the Optimity Loan Collateral under the Optimity Security Agreement, Plaintiff filed the Optimity Financing Statement on June 23, 2017 with the Delaware Department of State as Filing No. 20174144348 which names Plaintiff as the secured party and Optimity as the debtor.

92.    The First LRM Mortgage constitutes a "security agreement" within the meaning of, and creates a security interest under, the UCC, with respect to the LRM Loan Collateral.

93.    To perfect its security interest in the LRM Loan Collateral, Plaintiff filed the LRM Loan Financing Statement in the Register's Office on September 20, 2018 in CRFN 2018000316030 which names Plaintiff as the secured party and LRM as the debtor.

94.    As set forth above, Borrowers have committed numerous breaches of their obligations under the Mortgages and other Loan Documents, which breaches amount to Events of Default under the Mortgages and other Loan Documents.

95.    Plaintiff therefore is now entitled to foreclose upon its perfected security interests in, and take possession of the Optimity Loan Collateral and the LRM Loan Collateral and to receive the proceeds from the sale thereof toward satisfaction of Borrowers' indebtedness, or to have the Optimity Loan Collateral and the LRM Loan Collateral deemed part of the Mortgaged Premises upon foreclosure and sale thereof, without waiver of any of Plaintiff's other rights and remedies.

**THIRD CAUSE OF ACTION**
(*Enforcement of Assignment of Leases and Rents*)

96.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 95 hereof as if more fully set forth herein.

97.    Pursuant to the Assignment of Leases and Rents provisions contained in Mortgages, LRM expressly and irrevocably assigned to Plaintiff: "All rents, income, issues and profits arising or issuing from the [Mortgaged Premises] and advantages and claims against guarantors of any Leases . . . including the Rents arising or issuing from all leases (including, without limitation, oil and gas leases), licenses, subleases or any other use or occupancy agreement now or hereafter

entered into covering all or any part of the [Mortgaged Premises]." (Ex. 9 (First LRM Mortgage) at Ex. C at 2; Ex. 14 (Second LRM Mortgage) at 3.)

98.     Pursuant to the foregoing Assignment of Leases and Rents, LRM also agreed "The foregoing assignment extends to Rents arising both before and after the commencement by or against the Mortgagor of any case or proceeding under any Federal or State bankruptcy, insolvency or similar law, and is intended as an absolute assignment and not merely the granting of a security interest.." (*Id.*)

99.     Pursuant to the foregoing Assignment of Leases and Rents, Plaintiff granted LRM "a license to collect, retain and use the Rents so long as no Event of Default shall have occurred and be continuing or shall exist." (*Id.*)

100.     Pursuant to the separate LRM Loan ALR, LRM similarly absolutely and unconditionally assigned to Plaintiff: "all of the Assignor's right, title and interest in and to the Leases, all of the rents, additional rents, charges, issues, profits and other payments for the use or occupancy of the [Mortgaged] Premises." (Ex. 11 (LRM Loan ALR) at 1.)

101.     That separate LRM Loan ALR similarly provides: "So long as no Event of Default shall exist under the  [LRM Loan] Note, the [First LRM] Mortgage or any of the other [LRM] Loan Documents and no event shall have occurred which, by the lapse of time or the giving of notice, or both, is or would become an Event of Default thereunder, [LRM] shall have a license to occupy the [Mortgaged] Premises as landlord or otherwise and to collect, use and enjoy the rents, issues and profits and other sums payable under and by virtue of any Lease (but only as the same become due under the provisions of such Lease) and to enforce the covenants of the Leases, provided that any amounts collected by [LRM] shall be held by [LRM] in trust for the benefit of

[Plaintiff] for use in the payment of all sums due on the Obligations."  (Ex. 11 (LRM Loan ALR) at § 5.)

102.    As a result of the Events of Default under the Loan Documents discussed herein, Plaintiff is entitled to exercise remedies under the LRM Loan Agreement, the Mortgages, the LRM Loan ALR and all other collateral assigned therein.  Upon the occurrence of such Events of Default, the revocable license granted to LRM is automatically revoked and Plaintiff shall immediately be entitled to receive and apply all rents.

103.    No other action or proceeding has been had at law or otherwise for recovery under the Mortgages or LRM Loan ALR is being foreclosed by Plaintiff.

104.    By virtue of the foregoing, Plaintiff is entitled to and should be granted, a judgment of specific performance of LRM's duties under the Mortgages and LRM Loan ALR mandating that LRM shall deliver to Plaintiff all Rents and Leases, if any, collected or held by LRM from and after the occurrence of the Events of Default, or hereafter collected or held by LRM, and requiring LRM to account therefore, and directing LRM to pay Plaintiff expenses, including its reasonable attorneys' fees and expenses.

## FOURTH CAUSE OF ACTION
### (Deficiency Judgment)

105.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 104 hereof as if more fully set forth herein.

106.    Pursuant to Section 9 of the Optimity Loan Note, upon the occurrence of an Event of Default, the Optimity Loan's outstanding principal balance and accrued interest together with any additional amounts payable thereunder may be accelerated and become immediately due and payable at Plaintiff's discretion without any notice or demand of any kind.

107.    Pursuant to Section 9 of the LRM Loan Note, upon the occurrence of an Event of Default, the LRM Loan's outstanding principal balance and accrued interest together with any additional amounts payable thereunder may be accelerated and become immediately due and payable at Plaintiff's discretion without any notice or demand of any kind.

108.    Numerous Events of Default occurred as discussed further above, thus rendering immediately payable to Plaintiff the outstanding principal balance and accrued interest together with all additional amounts payable under the Optimity Loan Note, the LRM Loan Note and the Forbearance Agreements.

109.    Under the First Optimity Guaranty, Rick McNabb unconditionally guaranteed the First Optimity Guaranty Obligations, which include, but are not limited to, payment of the entire amounts due and owing under the Optimity Loan Documents.

110.    Under the Second Optimity Guaranty, LRM unconditionally guaranteed the Second Optimity Guaranty Obligations, which include, but are not limited to, payment of the entire amounts due and owing under the Optimity Loan Documents.

111.    Under the LRM Guaranty, Optimity and the McNabbs unconditionally guaranteed the LRM Guaranty Obligations, which include, but are not limited to, payment of the entire amounts due and owing under the LRM Loan Documents.

112.    The Notes are valid, binding and enforceable contracts between Borrowers and Plaintiff.

113.    The Guaranties are valid, binding and enforceable contracts between Optimity, LRM, and the McNabbs, as Guarantors, and Plaintiff.

114.    The Forbearance Agreements are valid, binding and enforceable contracts between Borrowers and Plaintiff.

115.    Plaintiff provided notice to Defendants of the Events of Default and demanded that Defendants pay the full amount of the indebtedness, including, without limitation, accrued but unpaid interest, to Plaintiff as required under the Loan Documents.

116.    To date, Defendants have failed to perform their respective obligations and are in breach of the Notes, the Loan Agreements, the Guaranties, and the Forbearance Agreements, due to, among other things, failing to pay to Plaintiff the entire indebtedness, including, without limitation, accrued but unpaid interest, Plaintiff's attorney fees and the outstanding Forbearance Fee Payment Obligations.

117.    Defendants Optimity, LRM and Rick McNabb are jointly and severally liable to Plaintiff for all sums due and owing under the Optimity Loan Note and the Optimity Guaranties.

118.    Defendants Optimity, LRM and the McNabbs are jointly and severally liable to Plaintiff for all sums due and owing under the LRM Loan Note and the LRM Guaranty.

119.    Defendants Optimity and LRM are jointly and severally liable to Plaintiff for all sums due and owing under the Forbearance Agreements.

120.    Plaintiff has been damaged by Defendants' failure to pay the entire indebtedness owed under the Notes and Guaranties.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands entry of judgment on its three causes of action, as against Defendants, as follows:

a)    adjudging that LRM and any other purported lessee of the Mortgaged Premises, and all persons claiming by, through, or under them and every person or entity whose right, title, interest, conveyance, or encumbrance is recorded subsequent to the filing of the Notice of Pendency of this action in

the Office of the Clerk of New York County with respect to this Complaint and this Action, be barred and foreclosed of all right, title, interest, claim, lien, and equity of redemption in and to the Mortgaged Premises and each and every part thereof including, but not limited to, any fixtures and the LRM Loan Collateral upon which the Mortgages are a lien attached to or used in connection with said premises;

b)      directing that said Mortgaged Premises, the LRM Loan Collateral and the Optimity Loan Collateral be sold according to law and that the moneys arising from such sale be brought into Court; and that the Mortgaged Premises and the LRM Loan Collateral shall first be offered as one parcel; and that Borrowers shall surrender possession to the purchaser or purchasers, of all items of property sold at the foreclosure sale;

c)      awarding Plaintiff the amounts due under the Loan Documents from the proceeds of the foreclosure sale with any and all applicable interest thereon to the time of such payment, together with the expenses of the sale and the costs, allowances, disbursements of this action, any sums advanced or paid by Plaintiff to protect the lien of the Mortgages including, but not limited to, taxes, water and sewer charges, assessments, insurance premiums and repair and maintenance costs in connection with the Mortgaged Premises, late charges due under the Loan Documents, and all other charges which may have been advanced by Plaintiff to protect the security afforded by the Mortgages and all other charges and liens on the Mortgaged Premises to be paid, with appropriate interest thereon from the dates of the respective

payments and advances thereof, so far as the amounts of such monies properly applicable thereto will pay the same, together with Plaintiff's attorneys' fees, cost and expenses of this action and all proceedings therein;

d)  declaring that the referee (or other officer) making such sale pay from the proceeds thereof all taxes, assessments, valuations and other charges which are liens on the property sold;

e)  directing that Plaintiff be awarded a deficiency judgment against Defendants pursuant to the Mortgages for an amount equal to any deficiency in the payment of their respective obligations to Plaintiff that may remain, to the extent that Borrowers are liable therefor pursuant to the Loan Documents or so much thereof as the Court may determine to be just and equitable, after a sale of the Mortgaged Premises and the application of the proceeds pursuant to the directions contained in such judgment, the amount thereof to be determined by the Court as provided in N.Y. Real Prop. Acts Law § 1371, together with late charges on such amount, interest thereon allowable under law, plus the reasonable costs and expenses incurred by Plaintiff in collecting such amounts (including, without limitation, attorneys' fees and costs);

f)  directing that advertisement of the notice of sale be made in New York County;

g)  directing that the purchaser or purchasers at said sale be let into possession on production or delivery of referee's deed or deeds;

h)     awarding to Plaintiff such other and further relief as may be just and proper,

including costs, disbursements and reasonable attorneys' fees in this action

to which Defendants expressly consented pursuant to the Loan Documents;

and

i)     granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
        August 17, 2022

DUANE MORRIS LLP

By:   /s David T. McTaggart
        David T. McTaggart
        Kevin Savarese
1540 Broadway
New York, New York 10036-4086
Tel.: (212) 692-1000
Fax: (212) 202-4931
Email: dtmctaggart@duanemorris.com
Email: ksavarese@duanemorris.com
*Attorneys for Plaintiff PNC Bank, National
Association*